# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MICHAEL A. FISHER,
    Plaintiff,

vs.

DR. CATALDI, et al.,
    Defendants.

Case No. 1:16-cv-605

Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff, a former inmate at the Lebanon Correctional Institution (LeCI), brings this pro se prisoner civil rights action under 42 U.S.C. § 1983 against LeCI defendants Dr. Cataldi and Ms. Smith, R.N., for violations of his constitutional rights. This matter is before the Court on defendants' motion for summary judgment and supporting exhibits (Docs. 30, 31) and plaintiff's memorandum in opposition (Doc. 38).

## A. Facts

Plaintiff's verified complaint alleges he had surgery in September 2015 for prostate cancer and that since the surgery he has had discharge and bleeding from his rectum. (Doc. 4). Plaintiff alleges that a urologist has ordered that he be seen for these symptoms but Dr. Cataldi "overlooked" his symptoms. Plaintiff cites to a medical record from December 1, 2015 from the Ohio State University Medical Center (OSUMC) showing that he "still has some blood per rectum" and noting "refer to GI [gastrointestinal] for blood per rectum." (Doc. 38-1 at 7). Plaintiff also contends that Dr. Cataldi "overlooked" nodules on a lobe of his lung, which plaintiff states "could be cancer as well." (Doc. 4). Plaintiff states that Dr. Cataldi discharged him from the pulmonary chronic care clinic when he knew plaintiff has lung diseases. (Doc. 38 at 2; Doc. 38-1 at 10). Plaintiff cites to an OSUMC record from January 13, 2016, which indicates imaging results showing a 0.6 cm nodule on his lung. (Doc. 38-1 at 13). In addition,

plaintiff alleges he has issues with chronic pain and with pain medication. Plaintiff states he has experienced chronic pain since undergoing open heart surgery in 2005 and he experiences pain during bowel movements. Plaintiff contends that Dr. Cataldi has tried to make him quantify the number of times he experiences pain even though the pain is chronic. (*Id.*). Plaintiff alleges defendant Smith is a health care administrator whose "job is to make sure that the doctor is given [sic] each inmate proper care." (*Id.* at 8). Plaintiff alleges that defendant Smith "allowed Dr. Cataldi to violate policies" and "saw the neglect from Dr. Cataldi, but also refused to do anything about it." (*Id.*).

Defendants present evidence that plaintiff arrived at LeCI on January 22, 2015 and transferred to Madison Correctional Institution ("MaCI") on June 13, 2016. (Doc. 31, Ex. A at 1- 2). Defendants have presented extensive records of plaintiff's medical visits, summaries, and encounters with Dr. Cataldi and other medical professionals at LeCI and OSUMC concerning treatment for plaintiff's numerous medical conditions. (Doc. 31, Exs. F, G, H, I, J, K). Dr. Cataldi estimates there have been approximately 180 encounters with plaintiff throughout his time at LeCI. (Doc. 31, Ex. B, Cataldi Declaration, ¶14; Doc. 31, Ex. G, FisherMed 00270-380).

1. Prostate Condition

Dr. Cataldi's first visit with plaintiff was on January 28, 2015. (Doc. 31, Ex. G FisherMed 0028). Dr. Cataldi assessed multiple medical problems, including hypertension, elevated lipid level, chronic chest wall pain, and elevated PSA level. Dr. Cataldi monitored plaintiff's prostate condition including by ordering and monitoring lab work, performing examinations, and referring plaintiff to a urologist for a prostate biopsy and to other off-site specialists. (Doc. 31, Ex. B, ¶¶ 11, 28; Doc. 31, Exs. F, G, H, I, K (d)). In May 2015, Dr. Cataldi informed plaintiff of the biopsy result, which was positive for prostate cancer. Dr. Cataldi ordered a urology consultation for a surgical evaluation. (Doc. 31, Ex. G FisherMed

2

00303-04). Dr. Cataldi continued to monitor plaintiff's prostate condition following the biopsy result. While plaintiff initially expressed uncertainty about pursuing surgery (*Id.* at 000298-29), following further discussions with Dr. Cataldi about his treatment options plaintiff eventually opted for and underwent surgery on his prostate gland on September 4, 2015. (*Id.* at 000295; Doc. 31, Ex. B, ¶ 19; Doc. 31, Ex. K, (d)). Upon his return to LeCI following surgery, plaintiff recovered in the LeCI infirmary and was returned to the general population on September 17, 2015. (Doc. 31, Ex. G at 000287).

## 2. Discharge from Rectum

Following his prostatectomy, plaintiff experienced symptoms of discharge and rectal bleeding. Plaintiff was seen by an OSUMC urologist on December 1, 2015 for a post-surgery consultation. (Doc. 31, Ex. H at 0084). Dr. Cataldi examined plaintiff on December 4, 2015 and reviewed his PSA results. Dr. Cataldi also ordered hemoccult testing to be performed on three separate days to test for blood in plaintiff's stools. (*Id.* at 0085). At plaintiff's next visit with Dr. Cataldi on December 15, 2015, Dr. Cataldi reported they were awaiting the results of the hemoccult testing. (Doc. 31, Ex. H at 0077-80). Dr. Cataldi states that plaintiff completed the hemoccult card tests and all three cards returned negative for fecal blood. (Doc. 31, Ex. B, ¶ 27). Dr. Cataldi states that if the tests had been positive for blood, he would have placed a referral for a gastrointestinal consultation. Because the tests were negative, a gastrointestinal referral was not warranted. (*Id.*).

In February 2016, Dr. Cataldi performed a digital rectal examination to check the site of the prostatectomy. (*Id.*, ¶ 26). Dr. Cataldi noted that an anal fissure was the source of plaintiff's pain. (*Id.*). Dr. Cataldi then prescribed Anusol ointment and the medicine was continued through May 2016. (*Id.*; Doc. 31, Ex. H at 0042-43). In a follow-up visit to OSUMC in March

2016, there were no objective signs of bleeding noted and no complaints of pain. Plaintiff was to follow-up with the urology specialist in six months. (Doc. 31, Ex. H at 0039).

### 3. Chronic Pain

Dr. Cataldi states that plaintiff had long-standing complaints of chronic pain, including chest pain. (Doc. 31, Ex. B, ¶ 28). Plaintiff was referred to OSUMC for several tests for chest pain, which were followed up by Dr. Cataldi with referrals, examinations and cardiology evaluations. (*Id.*; Doc. 31, Exs. F, G, I, K). During plaintiff's multiple examinations, his presentation and vital signs did not indicate he was in distress. (Doc. 31, Ex. B, ¶ 32; Doc. 31, Exs. F, H). Plaintiff complained repeatedly of chest pain; however, examinations related to this pain, including cardiac studies, indicated that the pain was not cardiac related. (Doc. 31, Ex. B, ¶ 39).

Plaintiff was seen at the emergency department on January 12, 2016 for complaints of chest pain after he developed pressure in his chest while jogging. (Doc. 31, Ex. J at 000392). Plaintiff's symptoms resolved with medication and he was subsequently transferred to OSUMC for further testing. (*Id.* at 00394-000458). On January 19, 2016, upon his return to LeCI, plaintiff was seen for his post-hospital discharge. Dr. Cataldi reviewed the OSUMC discharge report and examined plaintiff. (Doc. 31, Ex. B, Cataldi Declaration, ¶¶ 29, 30; Doc. 31, Exs. F, H). Dr. Cataldi noted that plaintiff's chest pain was not cardiac in origin, and he should accept that he will have chronic, recurrent chest pain and that Ultram/Tramadol will not eliminate the pain. Dr. Cataldi also observed that the OSUMC report advised plaintiff to lose weight as his weight may be a contributing factor and recommended that he reduce his Ultram/Tramadol intake. (Doc. 31, Ex. B, ¶ 29; Doc. 31, Ex. H at 0047). That same day, Dr. Cataldi reduced plaintiff's prescription for Ultram/Tramadol. (Doc. 31, Ex. B, ¶ 30; Doc. 31, Ex. H at 0080). Dr. Cataldi readjusted plaintiff's medications on February 11, 2016. (Doc. 31, Ex. B, ¶ 30). He also

placed a consultation request to the Mental Health Department to assist plaintiff in managing his chronic pain. (*Id.*, ¶ 31). On April 24, 2016, plaintiff complained of chest pain and Dr. Cataldi ordered promethazine and 650 mg of aspirin as a form of pain control and instructed nursing to monitor him for one hour. (*Id.*, ¶ 41). He also ordered sublingual Nitroglycerin in an effort to reduce plaintiff's chest pain. (*Id.*). On April 26, 2016, plaintiff was admitted to the infirmary for complaints of dizziness. Dr. Cataldi suspected that plaintiff was experiencing the effects of withdrawal from Ultram/Tramadol (an opioid) and increased the Tramadol to 50 mg, twice daily as needed. (*Id.*, ¶ 42). The dizziness cleared and plaintiff was released from the infirmary one day later. (*Id.*). Dr. Cataldi states he attempted to decrease the amount of Ultram/Tramadol he had prescribed for plaintiff as a means of weaning him off "this addictive opioid-type drug." (*Id.*, ¶ 43). Dr. Cataldi states that plaintiff "did tend to ask for more pain medication" and they "had disagreements about what he should be prescribed." (*Id.*, ¶ 34). Dr. Cataldi states that during his course of treating plaintiff, he attempted to have plaintiff log how often the pain occurred and when and what activities he was engaged in that brought about these disturbances. (*Id.*, ¶ 33).

    4. Lungs/Pulmonary

Dr. Cataldi states that he treated plaintiff for various pulmonary problems, including a nodule on the left lung. (Doc. 31, Ex. B, ¶ 44). A January 14, 2016 CT scan revealed a 0.6 cm nodule on the lobe of plaintiff's left upper lung. (Doc. 31, Ex. J at 000402, 000412; Doc. 31, Ex. K(b)). Dr. Cataldi avers that he continued to follow up on plaintiff's lung issues, including by ordering CT scans, to monitor the condition to determine if the nodules changed in any way. (Doc. 31, Ex. B, ¶ 44; Doc. 31, Exs. F, H). A CT scan was ordered in March 2016 and additional tests were conducted on July 15 and August 22, 2016. (Doc. 31, Ex. B, ¶ 44; Exs. F, K).

Plaintiff was subsequently transferred to Madison Correctional Institution on June 13, 2016 and Dr. Cataldi had no further contact with plaintiff. (Doc. 31, Ex. A).

5. Nurse Monna Smith, HCA

Defendant Nurse Monna Smith, the Health Care Administrator at LeCI, states that the Chief Medical Officer – Dr. Cataldi – is responsible for the day-to-day medical care of offenders at the institutional level and "has sole responsibility over all matters regarding purely clinical judgment." (Doc. 31, Ex. C, ¶¶ 8, 10). As the Health Care Administrator, defendant Smith is responsible for ensuring "that medical operations services (infirmary) are available to inmates on a day to day basis." (*Id.*, ¶ 9). Defendant Smith states that plaintiff has a complex medical history and had visited the infirmary on a regular basis for his various medical issues. (*Id.*, ¶ 18). Defendant Smith avers that she never observed any violations of departmental medical protocols on the part of Dr. Cataldi. (*Id.*, ¶¶ 11, 12, 14, 21). Defendant Smith states that plaintiff did tend to ask for more medication (Ultram/Tramadol) and had disagreements about what he should be prescribed. (*Id.*, ¶ 19).

**B. Summary Judgment Standard**

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. The court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at

6

255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

When a defendant has identified the shortfall in a plaintiff's case, the plaintiff must come forward with evidence establishing a material issue of fact for resolution by the fact-finder. *Anderson*, 477 U.S. at 252. The Court is not obligated to "comb through the record to ascertain whether a genuine issue of material fact exists." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 492 (6th Cir. 2000) (citing *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 407, 410 (6th Cir. 1992)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

**C. Resolution**

    1. Eleventh Amendment Immunity

Defendants contend they are entitled to summary judgment on plaintiff's official capacity claims as they are immune from suit under the Eleventh Amendment.

It is well-settled that "a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Cowan v. University of Louisville School of Medicine,* 900 F.2d 936, 940 (6th Cir. 1990) (quoting *Quern v. Jordan,* 440 U.S. 332, 337 (1979)), *overruled on other grounds by*

*Hafer v. Melo,* 502 U.S. 21, 27 (1991); *see also Edelman v. Jordan,* 415 U.S. 651, 663 (1974).

The Eleventh Amendment serves to prohibit a federal court from hearing a damages claim against a state and its entities except where Congress has explicitly abrogated a state's immunity to suit on the face of a statute or where the state itself has consented to suit. *Cowan,* 900 F.2d at 940; *see also Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238 (1985). Congress did not abrogate state immunity to suit under 42 U.S.C. § 1983, *see Will v. Mich. Dept. of State Police,* 491 U.S. 58, 66-67 (1989) and *Quern,* 440 U.S. at 340-41, and the State of Ohio has neither constitutionally nor statutorily waived its Eleventh Amendment immunity in the federal courts, *see Johns v. Supreme Court of Ohio,* 753 F.2d 524 (6th Cir. 1985), and *State of Ohio v. Madeline Marie Nursing Homes,* 694 F.2d 449 (6th Cir. 1982). A suit against defendants in their official capacity would, in reality, be a way of pleading the action against the entity of which defendants are agents, *i.e.,* the State of Ohio. *See Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 690 (1978). Thus, actions against state officials in their official capacity are included in this bar. *Will,* 491 U.S. at 70-71. Therefore, defendants in their official capacities are immune from a suit for damages under the Eleventh Amendment. *Barker v. Goodrich,* 649 F.3d 428, 433 (6th Cir. 2011). *See also Thiokol Corp. v. Dept. of Treasury, State of Mich.,* 987 F.2d 376, 381 (6th Cir. 1993) (noting that the Eleventh Amendment "also bars suits for monetary relief against state officials sued in their official capacity"). Accordingly, plaintiff's damages claim against defendants in their official capacities should be dismissed.

2. Deliberate Indifference Claims

Defendants also seek summary judgment on plaintiff's Eighth Amendment claims against them in their individual capacity.

To establish a violation of his Eighth Amendment rights resulting from a denial of medical care, plaintiff must show that defendants were deliberately indifferent to his serious

medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Brooks v. Celeste*, 39 F.3d 125, 127 (6th Cir. 1994). A constitutional claim for denial of medical care has objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001). The objective component requires the existence of a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834. A medical need is "sufficiently serious" if it either "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gunther v. Castineta*, 561 F. App'x 497, 499 (6th Cir. 2014) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

The subjective component requires an inmate to show that prison officials had "a sufficiently culpable state of mind" in denying medical care. *Farmer*, 511 U.S. at 834. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Gunther*, 561 F. App'x at 500 (quoting *Harrison*, 539 F.3d at 518). "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). Thus, to prove the subjective component, plaintiff must show that defendants: (a) subjectively knew of a risk to his health; (b) drew the inference that a substantial risk of harm to him existed; and (c) consciously disregarded that risk. *Farmer*, 511 U.S. at 837-38. The Sixth Circuit distinguishes between Eighth Amendment claims alleging a complete denial of medical care and those contesting the adequacy of medical care actually received. *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). Courts are generally reluctant to second guess the medical judgments of doctors and where a prisoner receives treatment for his medical condition, he must show that the treatment was "so woefully inadequate as to amount to no treatment at all." *Id.*

(quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).

The Court assumes, for purposes of the motion for summary judgment, that plaintiff's medical conditions outlined above are sufficiently serious and meet the objective component of the Eighth Amendment. Nevertheless, the undisputed evidence of record establishes that defendants are entitled to summary judgment as plaintiff fails to satisfy the subjective component of his Eighth Amendment deliberate indifference claim. Plaintiff has failed to present evidence creating a genuine issue of fact that Dr. Cataldi consciously disregarded any risk to plaintiff's health based on the many medical conditions from which he suffered. *Farmer*, 511 U.S. at 839, 844; *Loggins v. Franklin Cty., Ohio*, 218 F. App'x 466, 472 (6th Cir. 2007). The evidence proffered by defendants overwhelmingly demonstrates that plaintiff received medical treatment from Dr. Cataldi for his prostate condition and rectal bleeding, chronic chest pain, and pulmonary/lung condition. Dr. Cataldi examined plaintiff on a routine basis for all of these conditions, made referrals to OSUMC specialists when he deemed the medical condition warranted such referral, and followed up with plaintiff after such referrals to provide continuity of care. Plaintiff does not dispute that he received treatment from Dr. Cataldi for his underlying medical conditions. Rather, it appears that plaintiff disputes the adequacy of treatment he received, which amounts to a difference of opinion between plaintiff and his medical providers as to the appropriateness of his treatment. For example, plaintiff complains that Dr. Cataldi "overlooked" his rectal bleeding, which was documented by OSUMC records following his prostatectomy. Plaintiff alleges that the doctors at OSUMC recommended he see a gastroenterologist for the bleeding, but Dr. Cataldi never referred him to a specialist. The evidence shows, however, that Dr. Cataldi ordered hemoccult tests to determine the presence of blood in plaintiff's stool. Because the test results were negative, indicating the absence of blood in plaintiff's stool, Dr. Cataldi determined that a referral to a gastroenterologist was not

10

medically warranted. Plaintiff presents no evidence that Dr. Cataldi knew plaintiff faced a substantial risk of serious harm from intermittent rectal bleeding and ignored that risk by not referring plaintiff to a gastroenterologist. *Farmer,* 511 U.S. at 847. Moreover, the fact that Dr. Cataldi may have disagreed with the OSUMC doctor as to the type of medical care warranted for plaintiff's rectal bleeding does not give rise to a deliberate indifference claim under § 1983. *Estelle,* 429 U.S. at 106-08. *See also McGee v. Turner,* 124 F.3d 198 (6th Cir. 1997) (unreported), 1997 WL 525680 at *5 (difference of opinion among professional as to accepted treatment does not constitute deliberate indifference); *Pohlman v. Stokes,* 687 F. Supp. 1179, 1182 (S.D. Ohio 1987) (complaint must allege more than malpractice, negligence, or difference in professional opinion).

Plaintiff also disagrees with the adequacy of treatment he received for chronic chest pain. The undisputed evidence shows that plaintiff was referred to OSUMC for several tests for chest pain, which were followed up by Dr. Cataldi with referrals, examinations and cardiology evaluations. (Doc. 31, Ex. B, ¶ 28; Doc. 31, Exs. F, G, I, K). Although Dr. Cataldi reduced plaintiff's dosage of Ultram/Tramadol following his January 2016 hospitalization for chest pain, this was based, in part, on the report from OSUMC doctors recommending a reduction in plaintiff's pain medication and Dr. Cataldi's concern with plaintiff's dependency on opioid medication. Dr. Cataldi regularly adjusted plaintiff's pain medications and placed a consultation request to the Mental Health Department to assist plaintiff in managing his chronic pain. Dr. Cataldi's management of plaintiff's chronic pain in these ways does not amount to deliberate indifference to plaintiff's chronic pain condition. While plaintiff may disagree with Dr. Cataldi's approach to managing his condition, such differences in opinion regarding the adequacy of treatment are insufficient to constitute deliberate indifference to plaintiff's medical needs. *See Estelle,* 429 U.S. at 107-08; *Westlake,* 537 F.2d at 860-61 n. 5.

Plaintiff also takes issue with Dr. Cataldi's decision to remove him from the pulmonary chronic care clinic and "overlooking" his lung nodules. It is undisputed, however, that Dr. Cataldi continued to treat plaintiff's pulmonary and lung conditions, ordering CT scans and other tests to monitor the nodules on plaintiff's lungs, despite removing plaintiff from the chronic care clinic. Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860 n. 5. *See also Tester v. Hurm*, No. 09-318, 2011 WL 6056407, at *2 (E.D. Ky. Dec. 6, 2011) (plaintiff failed to establish deliberate indifference claim where prison officials refused to provide inmate Tramadol due to its narcotic effects). The issue is not whether plaintiff received medical treatment which he deems appropriate or meaningful, but rather whether Dr. Cataldi was deliberately indifferent to plaintiff's medical needs in the provision of medical care to plaintiff. "[A] desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim." *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014). While plaintiff may disagree with the treatment he ultimately received from Dr. Cataldi, the Court cannot say that such treatment was so "woefully inadequate as to amount to no treatment at all." *Westlake*, 537 F.2d at 860-61 n. 5. *See also Alspaugh*, 643 F.3d at 169 ("While at multiple points . . . [the prisoner] certainly would have desired more aggressive treatment, he was at no point denied treatment."). A claim for "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

Likewise, plaintiff has failed to create a genuine issue of fact as to whether defendant Nurse Smith was deliberately indifferent to plaintiff's medical care. The gist of his claim against defendant Smith is that Smith failed to properly supervise Dr. Cataldi in treating plaintiff's medical conditions. However, the undisputed evidence shows that defendant Smith, as the LeCI

12

Health Care Administrator, had no authority over Dr. Cataldi's medical decision-making. Rather, her role is to supervise the provision of medical care through the prison infirmary. Plaintiff presents no evidence or allegations that he was denied proper treatment in the prison infirmary over which defendant Smith had control. Therefore, plaintiff fails to establish his Eighth Amendment deliberate indifference claim against defendant Smith.

In sum, there is no issue of fact as to whether defendants acted with deliberate indifference in the provision of medical treatment to plaintiff. Summary judgment should be granted for defendants on plaintiff's § 1983 claim.

## IT IS THEREFORE RECOMMENDED THAT:

1. Defendants' motion for summary judgment be granted.

2. The Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that for the foregoing reasons an appeal of the Court's Order would not be taken in good faith. *See McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997).

Date: 1/9/18

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MICHAEL A. FISHER,
    Plaintiff,

    vs.

DR. CATALDI, et al.,
    Defendants.

Case No. 1:16-cv-605
Black, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).